471 P.2d 867

**U–BEVA MINES, a corporation,
Plaintiff and Appellant,**

**v.**

**TOLEDO MINING COMPANY, formerly
American Mining Company, a corporation, Defendant and Respondent.**

No. 11960.

Supreme Court of Utah.

July 7, 1970.

---

1. Clark v. Turner, 15 Utah 2d 83, 387 P.2d 557; Bryant v. Turner, 19 Utah 2d 284, 431 P.2d 121; Brown v. Turner, 21 Utah 2d 96, 440 P.2d 968.

McCullough & McCullough, Leland S. McCullough, Salt Lake City, for plaintiff and appellant.

Pugsley, Hayes, Watkiss, Campbell & Cowley, James P. Cowley, Glen E. Davies, Salt Lake City, for defendant and respondent.

HENRIOD, Justice:

Appeal from a no-cause judgment in a suit instituted 1) to cancel a mining lease with purchase option and 2) to recover damages for depositing tailings on the sub-

ject property. Affirmed, with costs to Toledo.

No one seems to have expressed any concern as to whether this action is one in equity, at law, or both. We think it immaterial, since the competent, admissible facts predominate in favor of affirmance,[1] and the substantial competent, admissible and believable evidence, viewed in a light favorable to respondent,[2] justifies such affirmance.

Succinctly stated, the facts may be chronologized as follows: On July 1, 1963, the mining lease was executed by the duly constituted officers of the U-Beva corporation, calling for $100 monthly payments plus percentage of smelter returns, with a right to have such payments credited to the purchase price if the lessee exercised an option to purchase for $100,000,—which was not as yet exercised at the inception of this litigation. The monthly payments nonetheless, religiously were paid both before and after U-Beva asserted its right to terminate the lease for failure to pay the 1967 taxes. More as to this later.

The lease required Toledo to pay all taxes touching the operation of the lease—both U-Beva's and Toledo's,—the apportionment thereof to be adjusted later. As an adjunct of this arrangement, the lease permitted Toledo to deduct U-Beva's personal tax

1. Stanley v. Stanley, 97 Utah 520, 94 P.2d 465 (1939), and cases cited as Shepardized in both directions.

2. Sullivan v. Turner, 22 Utah 2d 85, 448 P.2d 907 (1968).

obligation from the $100 payments. Toledo never made any such deductions, thus producing some kind of a credit, at least in equity, against some unforeseen failure of Toledo to pay such taxes. Such conclusion at least inferentially seems apparent since U-Beva made no attempt to claim otherwise. No one suggested that assuming the existence of such a credit for such purpose, Toledo was not correct in asserting that it amply exceeded U-Beva's 1967 tax burden of about $87,—the actual nonpayment by Toledo being the gravamen of U-Beva's justification for termination of the lease.

Besides the provisions of the lease mentioned above, there were other provisions paraphrased as follows: 1) That for any breach of the agreement by lessee, the lessor might terminate 60 days after written notice of *intention* to terminate for breach, unless the lessee had cured it in the interim; 2) That the lessee had a right to "use and operate the land" as it "may deem necessary and convenient *in connection with its * * * operations on adjoining property*"; 3) That the lessee shall operate in minerlike fashion and with regard to "workability of the workings of the leased premises," but not in limitation of the rights set forth in the immediate preceding provision.

Toledo used about 4.6% of the leased premises (on which there were no existing "workings") as a dump for tailings from its own contiguous claims. A U-Beva witness told what the costs would be, in his opinion, if the tailings required removal, and also that the tailings would interfere with *surface*, not *underground* mining *if* pay dirt were encountered—the existence of which or extent under the dump had not been ascertained,—all of which testimony probatively was of an "iffy" nature.

On December 13, 1967, U-Beva wrote Toledo advising that the 1967 taxes had not been paid. On February 21, 1968, U-Beva wrote Toledo again advising of the delinquency, saying it had paid the taxes and that the lease had been rejected by the stockholders, and stating also that: "As you should know, this is sufficient cause for cancellation of your rights to this mining property." A week later, on February 29, 1968, U-Beva sent another letter to Toledo, notifying the latter of the former's termination of the lease. On that same day, February 29, in a letter that almost obviously crossed in the mails, Toledo sent U-Beva a check for $95, covering the taxes, interest and penalties. This was long before the property could not be protected by payment of the taxes during the redemption period. It is debatable whether U-Beva's first letter constituted a notice of "intention" to terminate or just a delinquency reminder, and whether the last two communications between the parties crossed in the mails, but assuming the first circumstance reflected an "intention" to ter-

minate and the last to be inaccurate, our conclusion here is the same.

With the above recited facts as a backdrop, we consider U-Beva's points on appeal:

I. *That the trial court erred in not voiding the lease for nonpayment of the taxes by Toledo after notice given of its breach.*

■ Assuming Toledo for some reason or another had a duty to pay the taxes irrespective of its built-in prerogative to pay them out of monthly rentals, the record seems to indicate that it complied with or corrected any inadvertence with respect to the lease provision on time or within a reasonable time after knowledge of possible departure, so as to be relieved from forfeiture,—particularly after expending some $55,000 pursuing the provisions of the lease. Although we have serious doubts as to whether Toledo was in default at all as to payment of the taxes, we are constrained to believe, and so conclude, that in equity it is relieved from any departure here, on the grounds that the defection was so minor as to invoke the offices of equity, and that at law substantial compliance with the contract, under the circumstances, would purge an erstwhile default under a generally ac-

cepted policy against forfeiture,[3] and that otherwise, there would be an unconscionability heretofore condemned by us, justifying the invocation of equitable principles restricting even the freedom of contracting improvidently.[4]

II. *That the trial court erred in not assessing damages against Toledo for dumping waste on the property, in violation of the lease provision mentioned in 3) above.*

■ In connection with this point on appeal, we made some observations supra with respect to the small percentage of the subject property used for tailings from contiguous claims, and the conjectural nature of the evidence as to damages, which would extend some distance in pointing up but a minor and possibly excusable departure from the lease. The facts mentioned, however, are not nearly so dispositive as are the evident facts that no actual damage to U-Beva was demonstrated and the practice was condoned for about four years without objection.[5] Nor can liability be predicated on any breach of the lease, since it is clear that deposit of the tailings specifically was authorized by the other provision of the lease mentioned in 2)

3. Molyneaux v. Town House, Inc., D.C. App., 195 A.2d 744 (1963) ; Mayflower Associates v. Elliott, 81 So.2d 719 (Fla. 1955).
4. See Perkins v. Spencer, 121 Utah 468, 243 P.2d 446 (1952), re facts that, without calling on equity, would lead to most

unconscionable results and unjust enrichment were the contract enforced to the letter. Compare Carlson v. Hamilton, 8 Utah 2d 272, 332 P.2d 989 (1958).
5. Alger v. Brighter Days Mining Corp., 63 Ariz. 135, 160 P.2d 346 (1945).

 

above, which see. We conclude, therefore, that the second point on appeal lacks merit as being inconsistent with the lease itself.

III. *That the lease was void because it it was not authorized or ratified by the stockholders, and therefore violated the provisions of Title 16–10–74, Utah Code Annotated 1953, having to do with sale of all the assets of a corporation.*

Toledo had no reason to believe that the lease had not been authorized by the stockholders, or that such authorization was required because it was the only asset of the company,—the latter fact not being completely established, but only stated to be so by one of the U-Beva officers—*four years after the lease's execution,* and only after termination asserted.

 It would appear also, that the statute mentioned inures to the benefit of the shareholders and is not assertable by the corporation itself.[6] It would hardly seem to lie in the corporation's mouth to assert invalidity of the lease under the statute after having received and kept monthly rentals for about four years. For the reasons stated we conclude that the third point also is without merit.

CROCKETT, C. J., and CALLISTER, and TUCKETT, JJ., concur.

ELLETT, Justice: (concurring in the result).

I concur in the result but am not prepared to say that the defendant is entitled to dump sterile rock and thereby cover the plaintiff's mountain soil under the contract provision which "permits the use of plaintiff's land as defendant may deem necessary and convenient in connection with its exploration and mining (underground or open pit) operations on adjoining properties." While only four percent of plaintiff's land may now be covered, it all may be covered by the end of the lease. This covering of plaintiff's land seems to me to be a form of "waste," but because defendant may remove it by or before the expiration of the lease, I am now concurring in the result of the main opinion.

6. 58 A.L.R.2d 784 (1958); Westerlund v. Black Bear Mining Co., 203 F. 599 (8th Cir. 1913).