# First Union National Bank v.
# Quality Carriers Inc.

2

*David R. Moffitt,* for plaintiffs.
*Paul J. Greco,* for defendants.

SHEPPARD, *J.,* October 10, 2000—This opinion is being submitted in support of this court's contemporaneous order sustaining, in part, and overruling, in part, the preliminary objections filed by defendants.[1]

## BACKGROUND

Chemical Leaman Corporation was formed in 1977 as a holding company to hold the stock of Chemical Leaman Tank Lines Inc. and several smaller entities. The family of Samuel and Eunice H. Niness owned a substantial number of shares of CLC stock, which were ultimately deeded to several Niness family trusts. By 1992, the plaintiff trusts held an aggregate total of 130,631 shares of CLC common stock. At that time, the plaintiff trust shares represented 14 percent of the then-outstanding shares of CLC common stock. Complaint at ¶¶18-20.

In the late 1980s, David Hamilton and George McFadden, then officers and directors of CLC, also held substantial quantities of CLC common stock. Plaintiffs allege that in 1986, Hamilton and McFadden joined in a bid for control of CLC, with the eventual goal of buying out CLC's public shareholders and taking CLC private. As part of this plan, Hamilton and McFadden began negotiations with the Niness family to purchase the plaintiff trust shares. These negotiations led to a framework for agreement under which the plaintiff trust shares would be exchanged for a new class of CLC preferred stock

---

1. Phillip J. Ringo, one of the defendants, has not raised preliminary objections. In the interest of brevity, however, the objecting defendants will be referred to throughout as "defendants."

with a cumulative stated value of $2.6 million. Under the original framework, the CLC preferred stock was to bear dividends at a rate of 12 percent per year until the time of redemption. However, for tax reasons, CLC requested a reduction in the dividend rate to 6 percent, with the additional 6 percent to be paid to members of the Niness family as consulting fees over a 10-year period. *Id.* at ¶¶21-24.

On August 28, 1992, the plaintiff trusts and CLC formalized their understanding by entering into an "exchange agreement." Under the exchange agreement, the plaintiff trusts exchanged all 130,631 of their shares of CLC common stock for an aggregate total of 130 shares of CLC series A preferred stock, with a stated value of $20,000 per share. As protection for the plaintiff trusts' investment, the designation statement for the series A stock provided that:

"No class or series of capital stock of the corporation shall be issued which shall be senior in priority in any way to the series A stock while any of the shares thereof are issued and outstanding. The corporation's shares of series A stock shall rank, as to dividends and upon liquidation, equally with each other and (i) senior and prior to the corporation's common stock, and (ii) senior to, or on a parity with, classes of series of capital stock (other than the corporation's common stock) hereafter issued by the corporation." Designation statement at section 3.

In addition, in the event of "liquidation," defined as "a complete liquidation, dissolution or winding up" of CLC,[2] the holders of series A stock are to receive the

2. The defendants argue that the term "liquidation" should be defined by case law, which they claim requires "a complete ending of a

stated value of their shares, plus any accrued dividends from the issuance date until the date of liquidation. The designation statement also gave CLC the unilateral right to redeem the series A stock at any time on the condition that it pay a premium if it exercised this right prior to 2000. Complaint at ¶¶25, 27, 29-31.

In connection with the exchange agreement, Niness, Graham and Littlepage executed written consulting agreements with CLTL, under which each was to be paid a total of $378,000 over a seven-year period. According to the complaint, the consulting agreements, which do not have integration clauses, are partial expressions of the parties' intent because they do not address the continuing employment of Niness, Graham and Littlepage for the three-year period from July 1999 through July 2002. The complaint further asserts that this omission was intentional and made at the insistence of CLTL, which feared that a written 10-year consulting agreement could be characterized as a dividend by the Internal Revenue Service. However, CLC (as CLTL's parent) allegedly assured the plaintiffs that the consulting agreements would not be terminated at the end of the seven-year term,

---

company's affairs and not merely a cessation of activities." Reply memorandum at 5-7 (citing *Firestone Tire & Rubber Co. v. MDC Corp.,* 1981 WL 1597 (E.D. Pa. Jan. 23, 1981); *Quadrangle Offshore (Cayman) LLC v. Kenetech Corp.,* no. 16362NC, 1999 WL 893575 (Del. Ch. Oct. 13, 1999), *aff'd,* 751 A.2d 878 (Del. 2000); and *Rothschild Int'l Corp. v. Liggett Group,* 474 A.2d 133 (Del. 1984)). However, the designation statement provides a specific definition for "liquidation." This designation statement definition is broader than the case law definition and includes not only "liquidation," as defined by case law, but also a dissolution or winding up of CLC.

but would be in effect for a total of 10 years, provided that the series A stock was not redeemed. *Id.* at ¶¶24, 32-34.

CLC subsequently issued two additional classes of capital stock: a series B convertible preferred stock and series C preferred stock. Both series B stock and series C stock were junior in priority to the series A stock, with a stated value of $6,000 per share and a 6 percent cumulative dividend payable quarterly. In May 1996, CLC converted 151 shares of CLC common stock held by Karen Szabo Lloyd into 151 shares of series B stock and also converted 302 shares of CLC common stock owned by another shareholder into 302 shares of series C stock. *Id.* at ¶¶35-39.

The complaint alleges that on August 28, 1998, Quality Distribution, then known as MTL Inc., acquired CLC in what was primarily a stock purchase transaction merger.[3] As part of the transaction, the former shareholders of CLC received $70 million in cash, $5 million in MTL preferred stock and $1.1 million in MTL common

---

3. According to the complaint, each of the individual defendants held a position with one of Quality Carriers, Quality Distribution, CLTL, (corporate defendants) or CLC at all relevant times:

Babbitt—Chairman of the Quality Carriers and Quality Distribution boards of directors, unspecified officer or director of CLC

Kasak—Unspecified officer of Quality Carriers and Quality Distribution, unspecified officer of CLC

Brandewie—Director and unspecified officer of Quality Carriers and Quality Distribution, unspecified officer and/or director of CLC

Ringo—Chairman of the board of directors and chief executive officer of CLC

O'Brien—Chief executive officer, director and chairman of the board of directors of Quality Distribution

stock. Quality Distribution financed the merger through $235 million in incremental term loans, $19.9 million in preferred equity and $12 million in common equity. Quality Distribution's borrowings were made pursuant to a credit agreement[4] and were guaranteed by CLC under a supplemental indenture. *Id.* at ¶¶40-43.

In early 1999, Quality Distribution memorialized the final stage of the merger in an agreement and plan of merger, dated February 25, 1999, and filed the relevant articles of merger in Pennsylvania, Virginia and Illinois on March 1, 1999. Under the plan of merger, three wholly-owned subsidiaries of Quality Distribution, including CLC, were merged into a single surviving corporate entity called Montgomery Tank Lines Inc.[5] As soon as the merger was completed, Montgomery's name was changed to "Quality Carriers Inc." As a result of the merger, all outstanding shares of CLC were canceled, with Quality Distribution owning all of the stock of the new Quality Carriers. *Id.* at ¶¶44-50.

Although Lloyd, the holder of series B stock, was notified of the merger and permitted to cash out her interest in CLC prior to its consummation,[6] the plaintiff trusts were never notified of the merger or of any related shareholder meetings, nor were they given compensation for

---

4. The credit agreement also involved the refinancing of $171 million in pre-existing CLC debt.

5. One of the other corporations merged into Montgomery was "Quality Carriers Inc.," a Virginia corporation. This corporation should not be confused with defendant Quality Carriers Inc., which is an Illinois corporation formerly known as "Montgomery Tank Lines Inc."

6. The complaint makes no allegations as to the holders of series C stock in the context of the merger.

their shares. In addition, the plan of merger was never presented to Niness, even though he was a member of CLC's Board of Directors.[7] *Id.* at ¶¶52-53.

During the course of 1999, Quality Distribution implemented a plan to integrate CLC into Quality Carriers, as a result of which the balance sheets of CLC and Quality Carriers were merged. The integration plan also included the termination and relocation of CLC employees, liquidation of CLC assets, and elimination of significant accounts. By the end of the calendar year, the complaint alleges, the integration of CLC into Quality Carriers was complete and irreversible. *Id.* at ¶¶57-59.

In the meantime, in mid-1999, the plaintiff trusts learned that CLC had been merged out of existence and demanded that they be paid the redemption price and premium for their series A stock.[8] In response, the defendants submitted a statement of correction to the Pennsylvania Secretary of State on November 16, 1999, purporting to undo the merger. *Id.* at ¶¶60-62.

On April 19, 2000, the plaintiffs filed a complaint seeking equitable relief for breach of the Pennsylvania Business Corporation Law. Plaintiffs also asserted claims based on a breach of fiduciary duty, breach of the exchange agreement and the designation statement, breach

---

7. The defendants appear to acknowledge that these allegations are true. They begin their memorandum of law by stating that "[t]his action concerns a mistake. On March 1, 1999, a plan of merger, which failed to comply with the Pennsylvania Business Corporation Law, 15 Pa.C.S. §101 et seq., was filed." Defendants' memorandum at 1.

8. According to paragraph 10 of the designation statement, the holders of series A stock were entitled to a premium of 5 percent if the stock is redeemed between June 16, 1998 and June 15, 1999.

of the consulting agreements and misrepresentation. In addition, the complaint seeks an accounting. *Id.* at ¶¶64-114.

Defendants filed preliminary objections on May 26 in the form of a demurrer to each of the counts. The objections are based on the following six arguments:[9]

(1) Plaintiffs have suffered no harm because no valid merger occurred;

(2) Even if the merger was effective, the plaintiffs' rights are limited;

(3) Individual plaintiffs' misrepresentation count is not sufficiently specific;

(4) The complaint does not present a legally sufficient claim for breach of the consulting agreements;

(5) Quality Distribution and Quality Carriers are protected from liability because of their corporate forms; and

(6) The breach of fiduciary duty claim against the individual defendants should be dismissed.

## DISCUSSION

For the purposes of reviewing preliminary objections in the form of a demurrer, all material facts in the pleading and all reasonably deducible inferences are assumed to be true. *Sevin v. Kelshaw,* 417 Pa. Super. 1, 7, 611 A.2d 1232, 1235 (1992). When presented with preliminary objections whose end result would be the dismissal of a cause of action, a court should sustain the objections "only in cases that are clear and free from doubt," *School District of Philadelphia v. Livingston-Rosenwink-*

---

9. While the defendants have raised 10 objections, each is based on one or more of the six arguments outlined.

*el P.C.,* 690 A.2d 1321, 1322 n.2 (Pa. Commw. 1997), and where "the pleader will be unable to prove facts legally sufficient to establish his or her right to relief." *Livingston-Rosenwinkel,* 690 A.2d at 1322 n.2. Furthermore,

"[I]t is essential that the face of the complaint indicate that its claims may not be sustained and that the law will not permit recovery. If there is any doubt, it should be resolved by the overruling of the demurrer. . . . Put simply, the question presented by demurrer is whether, on the facts averred, the law says with certainty that no recovery is possible." *Bailey v. Storlazzi,* 729 A.2d 1206, 1211 (Pa. Super. 1999).

In the event a preliminary objection based on legal insufficiency in the nature of a demurrer is granted, the pleader generally has a right to file an amended pleading if she has not done so already. 5A Standard Pa. Practice 2d §25:66. See also, *Otto v. American Mutual Insurance Co.,* 482 Pa. 202, 205, 393 A.2d 450, 451 (1978) (stating that "[t]he right to amend should not be withheld where there is some reasonable possibility that amendment can be accomplished successfully."). Consequently, if the court sustains the defendants' demurrer on any count, the plaintiffs should be permitted to amend the complaint.

### I. *Defendants' Argument, That Because No Valid Merger Occurred, the Plaintiffs Have Suffered No Harm, Is Without Merit* [10]

"This action," the defendants assert, "concerns a mistake" and should be dismissed. Defendants' memoran-

---

10. This serves as a basis for objections 1, 2, 3, 6 and 10, which address Counts I, II, III, V and VI.

dum of law at 1. They claim that because the merger was flawed, it was void ab initio and no injury to the plaintiffs occurred. What the defendants fail to emphasize is that they were the architects of the merger and that they themselves failed to give the plaintiff trusts the notice required by Pennsylvania law. This failure to inform the plaintiff trusts of the merger cannot now be invoked in an effort to dismiss the complaint and the allegations of injury.

As a result of the exchange agreement, the plaintiff trusts allege that they relinquished "substantially all control over the management and operations of CLC," while retaining $2.6 million in CLC capital stock. Complaint at ¶26. The plaintiff trusts allege that a material inducement for remaining heavily invested in CLC was the assurance that their interest "was protected by the priority of the series A stock." *Id.* at ¶27. Specifically, the designation statement assured them that if CLC elected to exercise its right to redeem these stocks prior to 2000, it would be "required to pay a premium for early redemption." *Id.* at ¶30.

Nonetheless, when the plan of merger was filed in Pennsylvania, Illinois and Virginia on March 1, 1999, the plaintiff trusts, as holders of series A stock, received no notice of the merger or compensation for their shares. *Id.* at ¶52. In contrast, a holder of series B stock was properly notified of the merger and thus able to cash out her interest in CLC, violating the seniority rights of the holders of series A stock. *Id.* at ¶¶54-56.

These allegations suggest why it would be inequitable to accede to the defendants' arguments that the allegations stem from a simple "mistake." Unfortunately, no

Pennsylvania case law is directly on point. In analyzing this issue of first impression, therefore, we should consider precedent from other jurisdictions.

Although the defendants cite Delaware precedent to support their argument that defective mergers are void ab initio, a careful review of pertinent decisions reveals that Delaware courts have taken a more nuanced approach, recognizing that some mergers are voidable while others are void. This view takes into account the fact that the interests of third parties are at risk if a merger can be declared void ab initio since, as a practical matter, third parties would likewise lack notice that they are dealing with a void entity. Furthermore, there is Massachusetts precedent also on point which this court submits is ultimately persuasive because of its thoughtful rationale.

After considerable reflection, this court concludes that it would be inequitable to adopt the defendants' position that the merger was void ab initio for the simple reason that the statutes violated by the defendants were designed to protect the interests of shareholders, here the plaintiff trusts. Any decision that allowed the defendants to use their own errors against the plaintiff trusts would reward them for their oversights in carrying out the merger.

A. Improper Mergers As Voidable or Void Ab Initio[11]

There is no Pennsylvania precedent that focuses on whether a defective merger is void ab initio or voidable,

---

11. As a preliminary matter, the court notes that the merger was facially valid. BCL section 1928 states that the merger of a domestic corporation into a foreign corporation is effective as of the date determined "according to the provisions of law of the jurisdiction in which

regardless of the type of defect. As a result, the defendants call the court's attention to Delaware case law, which generally holds that "[a] merger that fails to comply with the statutory requirements for a merger is void ab initio." *Arnold v. Society for Sav. Bancorp Inc.,* no. 12883, 1995 WL 376919 at *2 (Del. Ch. June 15, 1995), *aff'd,* 678 A.2d 533 (Del. 1996). This falls under Delaware's policy of holding void those acts that the corporation "has no implicit or explicit authority to undertake or those acts that are fundamentally contrary to public policy." *Solomon v. Armstrong,* 747 A.2d 1098, 1114 (Del. Ch. 1999). However, it is not clear that any statutory defect will render a merger void, as opposed to voidable. See *Jackson v. Turnbull,* civil no. 13042, 1994 WL 174668 at *5 (Del. Ch. 1994) (questioning whether failure to comply with one provision of Delaware merger statutes would be sufficient to warrant invalidation of a merger).

Moreover, it is important to recognize that Delaware does not regard every flawed merger as void ab initio. Where a merger has been effected through a breach of the directors' fiduciary duty, the merger is voidable at

---

the foreign corporation is incorporated, but not until articles of merger or articles of consolidation have been adopted and filed." Under the corporate law of Illinois, the state of Quality Carriers' incorporation, a merger is "effective upon the issuance of the certificate of merger, consolidation or exchange by the secretary of state or on a later specified date, not more than 30 days subsequent to the issuance of the certificate by the secretary of state, as may be provided for in the plan." 805 Ill. Comp. Stat. §5/11.40. The articles of merger were filed and the Illinois certificate of merger was issued on March 1, 1999, setting this as the date on which the merger would be effective.

the discretion of the court. *Arnold,* 1995 WL 376919 at *3. Similarly, a merger is voidable, not void ab initio, if the board of directors fails to reach an informed business judgment approving the transaction. *Smith v. Van Gorkom,* 488 A.2d 858, 889 (Del. 1985).

The Delaware general rule finding mergers void ab initio if they fail to comply with the relevant statutes is not universally recognized. Massachusetts has rejected the Delaware approach and has held that a merger that does not fulfill the statutory requirements for a merger is voidable, not void. *Pitts v. Halifax Country Club Inc.,* 476 N.E.2d 222 (Mass. App. Ct. 1985). In *Pitts,* a corporation failed to comply with Massachusetts statutory mandates requiring notice of a merger to shareholders and approval of the merger by two-thirds of the outstanding shares. The Appeals Court of Massachusetts held that, because the statutory provisions were intended to protect shareholders, the corporation's errors "do[] not void the merger per se, but instead make[] it voidable at the insistence of a shareholder who for any reason objects to the merger and is not by his actions estopped from voicing his objection thereto." 476 N.E.2d at 227. Using similar reasoning, the United States Supreme Court has held that a merger is merely voidable when it is conducted in violation of the 1934 Securities Exchange Act. See *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 386-89 (1970). See also, William M. Fletcher, 15 Cyclopedia of the Law of Private Corporations section 7063 (a failure to comply with statutory requirements renders a merger voidable, not void).

Although no Pennsylvania cases address this precise issue, the courts of this Commonwealth have refused to

regard corporate decisions that fail to comply with the BCL as void. See *Fishkin v. Hi-Acres Inc.,* 462 Pa. 309, 316-17, 341 A.2d 95, 98 (1975) (a sale of assets where the selling corporation fails to comply with the BCL is voidable, not void ab initio); *Soloski v. Hetrick,* 396 Pa. Super. 140, 578 A.2d 445 (1990) (declining to declare an issuance of stock in violation of the BCL void ab initio). Pennsylvania courts addressing non-corporate issues often do not resort to the extreme measure of declaring an action void ab initio. See *e.g., Warehime v. Warehime,* 722 A.2d 1060, 1066 (Pa. Super. 1998), *appeal granted in part,* 557 Pa. 3, 731 A.2d 128 (1999) (a trustee's action that violates the duty of loyalty to the beneficiary is voidable); *Empire Properties Inc. v. Equireal Inc.,* 449 Pa. Super. 476, 485-86, 674 A.2d 297, 302 (1996) (a contract made in violation of Pennsylvania's Statute of Frauds is not void); *Ostrowski v. Pethick,* 404 Pa. Super. 392, 397-98, 590 A.2d 1290, 1292-93 (1991) (default judgments entered in violation of the Soldiers' and Sailors' Act are voidable, not void).

There are reasons favoring the view that a merger that fails to comply with the BCL should be deemed voidable, not void. This approach allows a court to evaluate the significance of the defects in the merger process and to weigh the seriousness of any harm done to the aggrieved parties before declaring the merger invalid. It also allows for a determination whether the errors were made in good faith and what additional damage the injured party may suffer if the merger is voided.

Finally, the practical interests of third parties are protected by this position, as the Delaware Supreme Court emphasized in its decision affirming *Arnold* and reject-

ing the plaintiff's argument that the directors' failure to disclose information in accordance with their fiduciary duty rendered a merger void ab initio:

"The principle asserted by plaintiff would create uncertainty for third parties dealing with Delaware corporations . . . . If a disclosure violation committed in good faith renders a merger void, third parties would be required to consider whether constituent corporations had disclosed all material facts in connection with the proxy solicitation leading to the merger vote. It is an understatement to note that this is a significant burden and would create uncertainty about the validity of mergers." *Arnold v. Society for Sav. Bancorp Inc.,* 678 A.2d 533, 537 (Del. 1996). Cf. *Fishkin,* 462 Pa. at 317, 341 A.2d at 99 (recognizing that, "although rescission may in some instances be an appropriate remedy, it is not, as the court below recognized, when the rights of third parties have intervened and the transaction has been completed."). For these reasons, this merger is voidable, and not void ab initio.[12]

## B. Statutory Violations Justifying Voiding the Merger

As an initial matter, no Pennsylvania appellate decision states unequivocally that a Pennsylvania court may

---

12. To the extent that this approach conflicts with that of Delaware law, it is important to note that no Pennsylvania case specifically states that Delaware corporate law is accorded special weight. Indeed, Pennsylvania courts have adopted positions that are at odds with their Delaware counterparts. See *Cuker v. Mikalauskas,* 547 Pa. 600, 692 A.2d 1042 (1997) (rejecting the Delaware approach to the business judgment rule).

invalidate a merger."[13] However, courts in other jurisdictions have voided mergers, using their equitable powers for the purpose of "setting aside or enjoining the enforcement of rights purportedly created by a tainted transaction." *SSMC Inc. N.V. v. Steffen,* 102 F.3d 704 (4th Cir. 1996) (citing *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 385 (1970)).[14] This precedent supports the conclusion that a merger may be declared void by Pennsylvania courts if the circumstances surrounding the merger demand it.

On the narrower issue of what statutory violations require voiding a merger, there is no clear Pennsylvania precedent. Although earlier Pennsylvania cases refuse to apply corporate rules rigidly in the context of a merger, see *York Haven Water & Power Co. v. Public Service Commission of Pa.,* 287 Pa. 241, 248, 134 A. 419, 421

---

13. While a handful of Pennsylvania cases address the validity of mergers that fail to comply with statutory requirements, nearly all of these cases are decisions of courts of common pleas with facts completely unlike those at hand. See *e.g., Gerstell v. Allentown Portland Cement Co.,* 30 D.&C.2d 223, 30 Leh. L.J. 145 (1963) (refusing to void merger where plaintiff shareholder had already deposited his shares as a dissenting shareholder). In addition, every Pennsylvania case that treats this issue predates the 1988-1990 codification of Pennsylvania corporate law, which resulted in substantial changes to sections relevant to this matter. See *e.g., Tibby Bros. Glass Co. v. Pennsylvania R.R. Co.,* 219 Pa. 430, 68 A. 975 (1908).

14. See also, *e.g., Nelson v. All Amer. Life & Fin. Corp.,* 889 F.2d 141 (8th Cir. 1989); *Albright v. Bergendahl,* 391 F. Supp. 754 (D. Utah 1974); *Arnold,* 1995 WL 376919 at *2; *Security Trust Co. v. Dabney,* 372 S.W.2d 401 (Ky. 1963); *Louisiana Ins. Guar. Ass'n v. Bernard,* 393 So.2d 764 (La. Ct. App. 1980); 19 C.J.S. Corporations §799c (noting that "[i]f a shareholder feels that merger was wrong, he may sue for conversion or rescission.").

(1926), recent decisions buttress the claim that "formalities are crucial in corporate law." *Seven Springs Farm Inc. v. Croker,* 748 A.2d 740, 749 (Pa. Super. 2000). Once again, this dearth of Pennsylvania law on the subject requires an analysis of precedent from other jurisdictions to determine what statutory violations allow a Pennsylvania court to declare a merger void.

Delaware precedent is not always clear as to what statutory errors require the voiding of a merger, as illustrated by a case cited by the defendants, *Jackson v. Turnbull,* civil no. 13042, 1994 WL 174668 (Del. Ch. Feb. 8, 1994), *aff'd,* 653 A.2d 306 (Del. 1994). In *Jackson,* the directors of L'Nard Restorative Concepts Inc. approved an agreement for the merger of L'Nard into Restorative Care of America Inc. While the L'Nard stockholders subsequently approved the merger in a written consent, and the certificate of merger was filed, the L'Nard Board of Directors failed to comply with a number of Delaware statutory provisions: they impermissibly delegated determination of the value of four stockholders' shares, failed to provide copies of the merger agreement to requesting stockholders and provided incorrect information about dissenting stockholders' appraisal rights. The Court of Chancery focused on the three flaws and concluded that the defects were fatal, and the merger void.[15.]

---

15. The plaintiffs in *Jackson* had also alleged that the different forms of consideration provided to stockholders of the same class of stock and misrepresentations to voting stockholders were also grounds for invalidating the merger. However, because "greater factual development" would be needed to address these two violations, the court did not discuss them and based its decision on the three clear violations. 1994 WL 174668 at *3.

Unfortunately, the *Jackson* court did not state whether each of the three statutory violations on its own was sufficient to void the merger, or whether the merger was void because of the combination of the three violations. Rather, in addressing the failure to provide copies of the merger agreement, the court stated that this failure "might not be enough, on its own, to warrant invalidation of the merger." 1994 WL 174668 at *5. Decisions that reference *Jackson* are no more instructive. See *e.g., Arnold,* 1995 WL 376919 at *2 (failing to address what statutory errors warrant voiding a merger).

Cases from other jurisdictions, however, hold that even the slightest derogation from statute in carrying out a merger can render the entire process invalid. In *Ziegler v. American Maize-Products Co.,* 658 A.2d 219 (Me. 1995), for example, the Supreme Court of Maine held that issuing additional shares to merger supporters to guarantee approval violated Maine corporate law, rendering the merger void. Cf. *Ellis v. State Nat'l Bank of Ala.,* 434 F.2d 1182 (5th Cir. 1970) (voiding merger of national and state banks on the basis of violations of state bank's charter); *Stone v. Dean,* 344 P.2d 649 (Okla. 1959) (enjoining merger where adequate notice was not provided to shareholders); *Farris v. Glen Alden Corp.,* 393 Pa. 427, 143 A.2d 25 (1958) (enjoining de facto merger where no adequate notice was provided to shareholders).

The merger defects and BCL violations[16] alleged by the plaintiffs in the complaint are far more serious than

---

16. Under the BCL, a plan of merger must set forth the manner and basis of converting the shares of each merging corporation, as well as the compensation to be provided shareholders who will not receive

those complained of in any of these cases. Here, the failure to notify shareholders that the corporation is going to be merged out of existence is no minor flaw. Further, the failure to provide shareholders with information regarding compensation and dissenters' appraisal rights is a grave breach of the BCL. Consequently, the violations of the BCL in this matter are sufficient for the court to void the merger.

## C. Equitable Considerations Against Voiding the Merger

The procedural posture of this case, however, is problematic. If the argument for voiding the merger were presented by the plaintiffs, the request would be granted. This decision would be based on the case law of other states, as well as the general principles of Pennsylvania corporate law, because the defendants' egregious errors in carrying out the merger would provide grounds for voiding the merger.

However, in each of the cases voiding a merger, it is the affected shareholder, not the corporate entity or its officers, who objects to the merger's validity. The matter at hand is distinctly different, because it is the defen-

---

shares of the new corporation. 15 Pa.C.S. §1922(a)(3). In addition, "[w]ritten notice of the meeting of shareholders that will act on the proposed plan shall be given to each shareholder of record, whether or not entitled to vote thereon, of each domestic business corporation that is a party to the merger or consolidation." 15 Pa.C.S. §1923(a). Accompanying the written notice must be a copy or a summary of the proposed plan and, if applicable, information relating to dissenters' rights. *Id.* Here, those responsible for complying with these BCL provisions have failed to meet those responsibilities.

dants, not the plaintiff trusts, who are attempting to use statutory technicalities to void a merger that they themselves effected. As a result, this court must consider whether statutory errors that are grounds for voiding a merger may be used defensively against innocent shareholders.

In examining this issue, this court is most strongly persuaded by the analysis of the United States Supreme Court in *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375 (1970). In *Mills,* the shareholders of a corporation alleged that the proxy statement sent out to solicit votes in favor of a merger was materially misleading in violation of the Securities Exchange Act of 1934. As relief, they asked that the merger be set aside.

Ultimately, the United States Supreme Court concluded that the merger need not be set aside "simply because the merger is a 'void' contract," and that the statute in question did not require "the court to unscramble a corporate transaction merely because a violation occurred." 396 U.S. at 386-87. According to the court, a more flexible approach is desirable:

"In selecting a remedy the lower courts should exercise the sound discretion which guides the determinations of courts of equity, keeping in mind the role of equity as the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims.

"[T]he guilty party is precluded from enforcing the contract against an unwilling innocent party, but it does not compel the conclusion that the contract is a nullity, creating no enforceable rights even in a party innocent of the violation . . . . The interests of the victim are suffi-

ciently protected by giving him the right to rescind; to regard the contract as void where he has not invoked that right would only create the possibility of hardships to him or others without necessarily advancing the statutory policy . . . .

"In short, in the context of a suit such as this one . . . the merger should be set aside only if a court of equity concludes, from all the circumstances, that it would be equitable to do so." 396 U.S. at 386-88. (citations omitted)[17]

The standard set forth in *Mills* has been followed by other courts analyzing corporate matters. For example, in *Pitts v. Halifax Country Club Inc.,* 476 N.E.2d 222 (Mass. App. Ct. 1985), the Massachusetts appellate court held that a failure to comply with statutory notice and approval requirements rendered the merger voidable at the insistence of the shareholders, stating that "[t]he purpose of such statutory provisions is to protect the rights of shareholders. A failure to adhere to their mandate will *not* normally be ground for invalidation *at the instance of others.* Statutory requirement intended to protect shareholders may be waived by shareholders." 476 N.E.2d at

---

17. The *Mills* decision is even more noteworthy considering the fact that the statutory language in question provided that:

"Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder . . . shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made . . . any such contract, and (2) as regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making . . . of such contract was in violation of any such provision, rule, or regulation . . . ." 396 U.S. at 386 n.8 (citing 15 U.S.C. §78cc(b)).

227-28. (citations omitted) (emphasis added) See also, *Turnbull Inc. v. Commissioner of Internal Revenue,* 373 F.2d 91, 94-95 (5th Cir. 1967) (a corporation is estopped from denouncing its own merger agreement as invalid); *Western Land Corp. v. Crawford-Merz Co.,* 62 F.R.D. 550 (D. Minn. 1976) (a corporation may not assert rights inuring to shareholders to void sale of assets); *Hibernia Nat'l Bank v. Smith,* 697 So.2d 1051, 1054 (La. Ct. App. 1997) (refusing to void a sale of stock where the person seeking to void the transaction was "not one of those persons for whose interest the ground for nullity was established"); *U-Beva Mines v. Toledo Mining Co.,* 471 P.2d 867, 869 (Utah 1970) (a statute providing for stockholder authorization of sale of corporate assets inures to benefit of shareholders and is not assertable by the corporation itself); 15 Fletcher section 7063 (merger notice and voting statutes are for the benefit of shareholders and may be enforced by them alone).

The logic supporting this line of cases is compelling. It is the aggrieved shareholder, and not the corporate violator of the law, who has the option of asking a court to rescind a transaction or declare a merger void. To permit a culpable defendant to prevent the victim from recovering based on the violator's own errors would be inequitable.

Moreover, this thinking is in keeping with principles espoused by Pennsylvania courts. In *Soloski v. Hetrick,* 396 Pa. Super. 140, 578 A.2d 445 (1990), for example, the court held that the defendant "corporation's failure to comply with . . . the Business Corporation Law was not intended to insulate the entity in an action brought by a shareholder." 396 Pa. Super. at 154, 578 A.2d at

452. Similarly, in *Empire Properties Inc. v. Equireal Inc.,* 449 Pa. Super. 476, 674 A.2d 297 (1996), our Superior Court stated that Pennsylvania's statute of frauds "is to be used as a shield and not as a sword, as it was designed to prevent frauds, not to encourage them." 449 Pa. Super. at 486, 674 A.2d at 302. (citations omitted) See also, *Fishkin v. Hi-Acres Inc.,* 462 Pa. 309, 316-17, 341 A.2d 95, 98 (1975) (a sale of corporate assets conducted in violation of the BCL is "voidable (under proper circumstances) by an aggrieved shareholder, . . ."); *Warehime v. Warehime,* 722 A.2d 1060, 1066 (Pa. Super. 1998), *appeal granted in part,* 557 Pa. 3, 731 A.2d 128 (1999) ("an action, though taken in good faith, which runs contrary to the interests of the beneficiary or in the self-interest of the trustee, is a violation of the duty of loyalty and is voidable at the option of the beneficiary").

In the instant case, any defects in the merger were due to the mistakes and fumbles of the defendants, while the shareholder plaintiff trusts were innocent parties. It is also significant that the BCL provisions that the defendants are accused of violating are designed for the protection of a corporation's shareholders, such as the plaintiff trusts. See 15 Fletcher section 7063 (the purpose of a statute requiring shareholder notice and approval of a merger is to protect the rights of the shareholders). Cf. *Fishkin,* 462 Pa. at 316-17, 341 A.2d at 98 (recognizing that the purpose of statutes requiring shareholder approval of a sale of corporate assets is the protection of minority shareholders).

Finally, while the defendants argue that the merger was void, they have taken no steps to reverse it other than filing the statement of correction months after becoming

aware of their errors.[18] The balance sheets and operations of CLC and Quality Carriers remain entangled, and other actions taken in conjunction with the merger, such as the purchase of all other CLC stock and the obligating of CLC as a guarantor of millions of dollars of Quality Distribution debt, have been left untouched. Moreover, there is no assertion that the defendants have taken any action to modify the articles of merger filed in Illinois and Virginia in connection with the merger.

Based on the present record, declaring the merger void would inequitably punish the plaintiff trusts and relieve the defendants of liability for their actions.

### D. Impracticability of Voiding the Merger

Even if the court were to conclude that declaring the merger void were equitable, the plaintiffs have alleged that "by the end of 1999, the integration of CLC into Quality Carriers was an accomplished fact and irreversible." Complaint at ¶60. As a result, if the facts in the complaint are accepted as true, as they must be in the context of a demurrer, voiding the merger would be impracticable.

---

18. The statement of correction has no impact on the validity of the merger. The defendants themselves acknowledge that the filing of the statement of correction was a "ministerial act of striking a void document from the records of the Department of State," and state that they have "never argued that the statement of correction demonstrated that the merger was void." Reply at 3 n.1. Even if the defendants were to raise this argument, it would fail: a statement of correction is used to correct inaccurate records of corporate action or defectively or erroneously executed documents, 15 Pa.C.S. §138, not to undo a corporate action that has already been effected. As a result, the statement of correction has no bearing on an evaluation of the merger's legitimacy.

Those states that allow rescission of a merger also take into consideration practical realities and refuse to void a merger where doing so is impracticable or not feasible. See *Del Nose v. Delyar Corp.*, no. 72 civil 1819-CLB, 1976 WL 813 (S.D.N.Y. July 30, 1976) at *25 (refusing to "unscramble" a merger where such remedy is impracticable); *Patents Mgmt. Corp. v. O'Connor,* C.A. no. 7110, 1985 WL 11576 (Del. Ch. June 10, 1985) at *2 (rescission request was "not a feasible remedy given the length of time that ha[d] elapsed since the merger"); *Coggins v. New England Patriots Football Club Inc.,* 492 N.E.2d 1112, 1119 (Mass. 1986) (holding that rescission would be inequitable and infeasible). Cf. *Fishkin v. Hi-Acres Inc.,* 462 Pa. 309, 317, 341 A.2d 95, 99 (1975) (noting that courts have rescinded sales of corporate assets "only where the transfer had not yet been completed, or upon a showing that the vendee had no equitable rights superior to those of the aggrieved shareholder"). Even in cases where rescission would be the most equitable remedy, courts have refused to grant such relief where it is not feasible. See *e.g., Strassburger v. Earley,* 752 A.2d 557, 579 (Del. Ch. 2000) (holding that a lawsuit brought nine months after acquisition did not preserve a full rescission remedy, even if such remedy would be most equitable).

Here, the complaint alleges that Quality Distribution has undertaken a number of actions under the integration plan, including:

"(a) Termination and relocation of many CLC operational and administrative personnel at the regional and national levels;

"(b) Elimination of all significant intercompany accounts and transactions;

"(c) Expenditures of over $14 million for severance and bonus payments to terminated CLC employees;

"(d) Merging of customer relationships;

"(e) Liquidation of CLC assets, including closure and/ or sale of truck terminal and administrative facilities, transfer of CLC's corporate jet to a former shareholder, and sale of a CLC subsidiary;

"(f) Obligating CLC as a guarantor of massive debt of the combined entities; and

"(g) Eliminating all goodwill associated with the Chemical Leaman name by holding the combined enterprise out to the public as 'Quality Carriers.' " Complaint at ¶58.

In addition, as of March 1999, the complaint alleges that the defendants "no longer separately accounted for CLC's assets, liabilities, retained earnings and shareholders' equity," rendering the integration of CLC into Quality Carriers irreversible. *Id.* at ¶¶59-60.

Assuming these facts true, as is required, CLC and Quality Distribution have been integrated to the point that invalidating and reversing the merger is realistically not doable. For all of these reasons, the court will not declare the merger void.[19]

---

19. Because the court has refused to declare the merger void, the court need not address the secondary issue raised by the plaintiffs as to whether a de facto merger occurred.

## E. Defendants' Actionable Conduct
## Caused Harm to Plaintiffs

In the event that the merger was effective, the defendants argue that they have undertaken no actionable conduct and that the plaintiffs have suffered no harm. This court disagrees.

The plaintiff trusts were never given notice of the merger or any related shareholder meetings, and the series A shares were not mentioned in the board of directors' resolution approving the merger. To make matters worse, CLC failed to notify the plaintiff trusts of any appraisal rights available to them.[20] These actions constitute violations of the BCL for which the plaintiff trusts are entitled to relief.[21]

The defendants' conduct also violated the designation statement in two distinct ways. First, the merger of CLC into Quality Carriers led to its liquidation, as the designation statement defines the term.[22] In the event that CLC was liquidated between June 16, 1998 and June 15, 1999, the plaintiff trusts were to receive $2.6 million, as the

---

20. While the defendants do not state so explicitly, the objections implicitly acknowledge that the plaintiffs met the requirements of subchapter D of chapter 15 and thus were entitled to dissenters' rights under Pennsylvania law.

21. See note [16], *supra.*

22. Under BCL section 1929(a), "[t]he separate existence of all corporations parties to the merger or consolidation shall cease, except that of the surviving corporation, in the case of a merger," and "the constituent companies are deemed dissolved." *Berks County Trust Co. v. Kotzen,* 326 Pa. 541, 543, 192 A. 638, 639 (1937). Because the designation statement includes dissolution in its definition of liquidation, as discussed at note [2], *supra,* the merger led to the liquidation of CLC.

stated value of the series A stock they held, plus an early redemption premium of 5 percent. The failure to make the required payments is a breach of the designation statement.

Furthermore, paragraph 5(a) of the designation statement specifically provides that no other form of CLC capital stock may rank senior to series A stock in the event of liquidation. These seniority rights were eviscerated when Lloyd, the sole series B stockholder, was provided with compensation for her CLC shares and the plaintiff trusts were not. As a consequence, the plaintiffs have alleged that the defendants' actions breached the priority provisions of designation statement as well.

Because the merger was valid, though voidable, and the defendants' alleged conduct is actionable, the objections are overruled to the extent that they are based on the defendants' argument that the merger is void.

## II. *The Plaintiffs' Remedies Are Not Limited to Appraisal Rights* [23]

Defendants next argue that, even if the court finds that the merger was valid, the plaintiffs may not seek relief beyond the dissenters' appraisal rights set forth in subchapter D of BCL chapter 15.[24] Furthermore, they contend that, even if other forms of relief are available, no provision of the BCL allows for an accounting. These arguments are unconvincing.

---

23. This serves as a basis for objections 2 and 3, which address Counts I and VI.

24. 15 Pa.C.S. §1571 et seq.

## A. Limitation of the Plaintiffs to Subchapter D Appraisal Rights

Under BCL section 1904,[25] which abolished the doctrine of de facto mergers, a transaction that in form satisfies the BCL merger requirements may be challenged only to the extent permitted by BCL section 1105.[26] BCL section 1105, in turn, states that:

"A shareholder of a business corporation shall not have any right to obtain, in the absence of fraud or fundamental unfairness, an injunction against any proposed plan or amendment of articles authorized under any provision of this subpart, nor any right to claim the right to valuation and payment of the fair value of his shares because of the plan or amendment, except that he may dissent and claim such payment, if and to the extent provided in subchapter D of chapter 15 (relating to dissenters' rights) where this subpart expressly provides that dissenting shareholders shall have the rights and remedies provided in that subchapter. Absent fraud or fundamental unfairness, the rights and remedies so provided shall be exclusive."

Effectively, BCL section 1105 allows for awards of money damages and rescission only if fraud or fundamental unfairness is present in a transaction. See 3 W. Edward Sell & William H. Clark Jr., Pennsylvania Business Corporations, 2d ed. section 1105.2.

Defendants attempt to bolster their argument that the plaintiffs' remedies are limited to dissenters' appraisal

---

25. 15 Pa.C.S. §1904.
26. 15 Pa.C.S. §1105.

rights by pointing to *In re Jones & Laughlin Steel Corp.*, 488 Pa. 524, 412 A.2d 1099 (1980),[27] in which Jones and Laughlin Steel Corporation merged with a second corporation and filed a petition seeking the appraisal and forced sale of dissenters' shares. The dissenters filed answers to the petition and raised a new matter that challenged the validity of the merger. As stated by the court, "[t]he crucial question [was] whether the legislature intended the . . . fair value appraisal to be the exclusive post-merger remedy available to dissenting shareholders." 488 Pa. at 530, 412 A.2d at 1102. (footnote omitted)

The *Jones* court answered this question in the affirmative, stating that there was no support for the proposition that a court could exercise the power to enjoin the abuses by majority shareholders in an appraisal rights hearing after the consummation of a merger. 488 Pa. at 531, 412 A.2d at 1103. As a result, the appraisal hearing court "did not possess the power to determine the substantive fairness of the transaction," although Pennsylvania law "implicitly recognizes the right of sharehold-

27. It is important to note that *Jones* was decided before significant changes were made to Pennsylvania corporate statutes between 1988 and 1990. As a result, *Jones* is helpful in that it outlines certain principles of Pennsylvania corporate law, but often refers to statutory provisions that did not survive the codification process. Other cases addressing the availability of alternate remedies present the same problem. See *e.g., Mortgage Building and Loan Association Case,* 334 Pa. 81, 100, 5 A.2d 342, 350 (1939) (stating that "a dissenting shareholder may enjoin the merger until he receives the value of his stock or is otherwise satisfied with regard to it"); *Lauman v. Lebanon Valley R.R. Co.,* 30 Pa. 42 (1858) (allowing the dissatisfied shareholder of a railroad company to pursue an equitable remedy).

ers to seek an injunction to prevent any proposed corporate plan fraught with fraud or . . . unfairness." 488 Pa. at 532, 534, 412 A.2d at 1103-1104 (basing its conclusion on sections of the BCL that have since been redrafted).[28]

There are, however, significant differences between the *Jones* case and this case. First, the claims in *Jones* were not based on any alleged tortious conduct or breach of contract by the defendants. Rather, the *Jones* court addressed whether a plaintiff shareholder may hijack an appraisal rights hearing convened by a merging corporation by raising new matter that asks the trial court to void a merger. Here, the court is not conducting an appraisal rights hearing but is providing a forum to address the plaintiffs' allegations of breach of contract, breach of fiduciary duty and misrepresentation, among others. Consequently, a substantial part of the reasoning in *Jones* does not apply.

Second, the *Jones* plaintiffs made no allegations "that any of the technical or procedural requirements for a merger [had] not been fully met." 488 Pa. at 531, 412 A.2d at 1103. Here, the plaintiffs assert a plethora of technical and procedural omissions by the defendants in completing the merger.

Moreover, to the extent that *Jones* addresses remedies available to dissenters, the plaintiffs do not fall within

---

28. Cf. *Fleming v. International Pizza Supply Corp.,* 676 N.E.2d 1051, 1058 (Ind. 1997) (limiting dissenting shareholder to appraisal procedure but allowing shareholder to raise claims of breach of fiduciary duty and fraud during appraisal process); *Steinberg v. Amplica Inc.,* 729 P.2d 683, 690 (Cal. 1986) (stating that there is "nothing in the appraisal statutes to prevent vindication of a shareholder's claim of misconduct in an appraisal proceeding").

that category. BCL section 1572 defines "dissenter" as a "shareholder or beneficial owner who is entitled to and does assert dissenters' rights under this subchapter and who has performed every act required up to the time involved for the assertion of those rights." In this case, the plaintiffs may have been entitled to dissenters' rights under subchapter D. However, there is no question that they did not assert these rights or perform the acts required to assert them, as they lacked notice of the merger due to the defendants' conduct. Accordingly, they cannot be considered "dissenters," as that term is used in the Pennsylvania statute.

Because *Jones* and other Pennsylvania precedent offer little guidance, it is necessary to examine closely the specific provisions of BCL section 1105. According to its provisions, a court is empowered to grant relief other than dissenters' rights to a shareholder only upon evidence of fraud or fundamental unfairness. Unfortunately, "Pennsylvania case law . . . does not provide much guidance on what constitutes fraud or fundamental unfairness within the meaning of section 1105." 3 Sell & Clark section 1105.5. The merger, however, was plagued by a number of serious defects:

—The defendants never submitted the plan of merger to the plaintiff trusts for consent or approval;

—The plaintiffs were never given notice of any meeting at which the plan of merger was submitted to CLC shareholders or voted upon;

—The plaintiffs were not given an opportunity to exercise dissenters' appraisal rights; and

—The merger was completed without compensating the plaintiffs for their shares of CLC stock.

Despite these omissions, the defendants argue that the plaintiffs have not complied with the strict requirements of the appraisal statute and that, because the right of appraisal is the sole remedy available, the plaintiffs are not entitled to any relief. This argument is untenable. By not fulfilling their statutory obligations, the defendants effectively precluded plaintiffs from exercising any appraisal rights available to them. Limiting the plaintiffs to appraisal rights that the defendants themselves made unavailable would constitute fundamental unfairness. Other remedies should therefore be available to the plaintiffs.

This conclusion has substantial support in the case law of other states. In *Walter J. Schloss Assocs. v. Chesapeake & Ohio Ry. Co.,* 536 A.2d 147 (Md. Ct. Spec. App. 1988), for example, the court found that "[e]ven in states having statutes purporting to make the 'payment of fair value' an exclusive remedy, the courts have allowed at least injunctive relief under special, compelling circumstances." 536 A.2d at 153 (citing *Jones* and comparing the *Jones* court's decision to allow access to injunctive relief with the limiting language found in BCL section 1515). See also, *Lerner v. Lerner Corp.,* 750 A.2d 709, 717 (Md. Ct. Spec. App. 2000) (relief other than appraisal rights is available to wronged shareholders); *In re Willcox v. Stern,* 219 N.E.2d 401, 405 (N.Y. 1966) ("equity will act—despite the existence of an appraisal remedy—where there is fraud or illegality"); 15 Fletcher section 7165 ("[w]here the shareholder alleges fraud, unfair dealing or breaches of fiduciary obligations, the shareholder should not be deprived of the remedies of rescission and injunctive relief"). Other cases hold that "a stockholder

who elects appraisal in ignorance of fraud in the merger will be entitled to rescind that election upon discovery of the fraud even though his election would otherwise be irrevocable under the appraisal statute." *Dofflemyer v. W.F. Hall Printing Co.,* 558 F. Supp. 372, 381 (D. Del. 1983).[29]

The decisions of these courts support the conclusion that under the present circumstances, the plaintiff trusts should be not limited to appraisal rights. As a result, in so far as the objections attempt to limit the plaintiffs' remedies to an appraisal, they are overruled.

## B. Availability of Accounting As a Remedy

The plaintiffs request that the court permit a full accounting of all transactions affecting the assets, liabili-

---

29. Other cases illustrating this point include: *Miller v. Steinbach,* 268 F. Supp. 255, 269-71 (S.D.N.Y. 1967) (exclusivity of appraisal rights under Pennsylvania merger statute relates only to mergers not tainted by fraud); *Cede & Co. v. Technicolor Inc.,* 542 A.2d 1182, 1188 (Del. 1988) (refusing to dismiss fraud claim where the plaintiff originally elected to pursue an appraisal remedy); *Perl v. IU Int'l Corp.,* 607 P.2d 1036, 1045 n.11 (Haw. 1980) ("[e]ven in states which by the terms of their statutes or by judicial interpretation have found appraisal an exclusive remedy, fraud is almost universally held to be an independent ground for the exercise of equitable jurisdiction"); *Gabhart v. Gabhart,* 370 N.E.2d 345, 355 (Ind. 1977) (allowing remedies other than appraisal proceedings if a shareholder questions the fairness of a merger); *Sifferle v. Micom Corp.,* 384 N.W.2d 503, 506 (Minn. Ct. App. 1986) (allowing remedies other than appraisal rights if a merger is fraudulent); *Matthews v. Wenatchee Heights Water Co.,* 963 P.2d 958, 964-65 (Wash. Ct. App. 1998), *review denied,* 980 P.2d 1284 (Wash. 1999) (dissenters' appraisal rights are not exclusive where there is actual fraud); 15 Fletcher section 7146 ("unless they have lost or waived their right or been guilty of inexcusable delay, shareholders

ties and shareholders' equity of CLC from August 28, 1998 to the present if they do not receive the other relief requested in the complaint. This, the plaintiffs claim, is necessary to determine the corporate defendants' receipt of CLC dividends, the existence of commingling and the extent to which Quality Distribution treated CLC as its own instrumentality.

The corporate defendants counter that an accounting is not available to the plaintiff trusts because they have not pled the requisite fiduciary duty and because the plaintiffs "have an adequate remedy available at law." Defendants' memorandum at 12; objections at ¶38. Again, this court must disagree.

In requesting an accounting, a complaint "seeks to turn over to the party wrongfully deprived of possession all *benefits* accruing to defendant by reason of its wrongful possession." *Boyd & Mahoney v. Chevron U.S.A.,* 419 Pa. Super. 24, 36, 614 A.2d 1191, 1197 (1992). (emphasis in original) Pennsylvania law does not permit equitable accounting "where no fiduciary relationship exists between the parties, no fraud or misrepresentation is alleged, the accounts are not mutual or complicated, or the plaintiff possesses an adequate remedy at law." *Rock v. Pyle,* 720 A.2d 137, 142 (Pa. Super. 1998). In reviewing a request for an accounting, "it is reasonable for the court to permit some latitude since often times it is not certain what claims a plaintiff may have until the accounting is

may attack [a merger] for fraud of which they were ignorant at the time they gave their consent").

But cf. *Steinberg v. Amplica Inc.,* 729 P.2d 683 (Cal. 1987) (refusing to rescind merger where the plaintiff knew of breaches of fiduciary duty prior to merger).

completed." *In re Estate of Hall,* 517 Pa. 115, 136, 535 A.2d 47, 57 (1987). (footnote omitted)

The corporate defendants assert that the plaintiffs have not met these standards because "[t]hey have not pled a fiduciary relationship between Quality Carriers and themselves. They have pled no fraud or misrepresentation. They have pled no facts giving them rights to review the information they seek . . . ." Defendants' memorandum at 12. However, the plaintiffs have alleged the elimination of CLC accounts and the merging of the balance sheets of CLC and Quality Carriers. Complaint at ¶58. Furthermore, the complaint asserts that Quality Distribution has disregarded CLC's separate corporate existence and has forced CLC to guarantee millions of dollars in Quality Distribution debt. *Id.* at ¶¶58-59. This suggests that the accounts in question are mutual and complicated. As a result, the plaintiffs have pled facts to sustain Count VI.

Quality Distribution and Quality Carriers also argue that the plaintiffs are not entitled to an accounting because they have an adequate remedy at law. However, nowhere in the objections or in their memorandum do they state what this remedy is, thereby fatally undermining this objection.

### III. *The Individual Plaintiffs' Count for Misrepresentation Is Sufficiently Specific* [30]

The individual plaintiffs allege that CLC and CLTL induced them to enter into the consulting agreements by

---

30. This serves as a basis for Objection 9, which addresses Count V.

representing that payments would be made for a total of 10 years. Complaint at ¶¶104-106. On this basis, the individual plaintiffs have included a count for misrepresentation. CLTL and Quality Carriers argue that this count does not meet the requirement that fraud be pleaded with specificity. The complaint, however, meets the applicable standard.

Pennsylvania recognizes three theories on which a misrepresentation action may be based: intentional misrepresentation, negligent misrepresentation and innocent misrepresentation. In order to state a viable cause of action for intentional fraudulent misrepresentation, a complaint must allege (1) a representation (2) which is material to the transaction at hand (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false, (4) with the intent of misleading another into relying on it, (5) justifiable reliance on the misrepresentation, and (6) the resulting injury was proximately caused by the reliance. *Bortz v. Noon,* 556 Pa. 489, 499, 729 A.2d 555, 560 (1999).

Under Rule 1019(b), allegations of fraud, including fraudulent misrepresentation, must be averred with particularity. While the complaint may be dismissed if the required standards are not met, *Muhammad v. Strassburger, McKenna, Messer, Shilobod and Gutnick,* 526 Pa. 541, 553, 587 A.2d 1346, 1352 (1991), the pleadings need only "explain the nature of the claim to the opposing party so as to permit the preparation of a defense" and "be sufficient to convince the court that the averments are not merely subterfuge." *Martin v. Lancaster Battery Co.,* 530 Pa. 11, 18, 606 A.2d 444, 448 (1992) (citing *Bata v. Central-Penn National Bank of Philadel-*

*phia,* 423 Pa. 373, 380, 224 A.2d 174, 179 (1966)). In determining whether fraud has been averred with the requisite particularity the court considers the complaint as a whole. *Commonwealth by Zimmerman v. Bell Telephone Co. of Pa.,* 121 Pa. Commw. 642, 551 A.2d 602 (1988).

The defendants claim that the complaint is not sufficiently particular in asserting fraud because the "plaintiffs have not identified who made these misrepresentations, when they were made, to whom they were made (*i.e.* to all three individual plaintiffs or only to one?), what exact statements were made, or how they evidenced an intent to induce plaintiffs' reliance." Defendants' memorandum at 17.

These objections are without merit. First, the facts alleged in the complaint explain the claim sufficiently and allow the defendants to prepare a defense: representatives of CLTL and CLC verbally assured the individual plaintiffs that the consulting agreements would continue beyond the seven-year term, and the shorter seven-year term was used as a tax planning device. Complaint at ¶¶104-105. Furthermore, the complaint alleges intent, reliance and resulting damages. Complaint at ¶¶106-107, 109.

The individual plaintiffs have also attached to the complaint a memorandum concerning the consulting arrangement. The memorandum is dated April 14, 1992 and is from George McFadden, then an officer and director of CLC. According to the memorandum, each of the individual plaintiffs was to receive consulting fees of $54,000 per year, with the period of payment being "*no less* than seven years, and payable thereafter through the tenth year

unless the preferred stock is redeemed prior to that time."[31] This alone supplies the requisite specificity to allow the defendants to prepare an adequate defense.

Moreover, the allegations in, and the documents attached to the complaint convince this court that the misrepresentation claim is not a mere subterfuge. As a result, Count V is sufficiently specific, and the objections on this ground are overruled.

## IV. *The Complaint Alleges a Breach of the Consulting Agreements* [32]

The defendants maintain that the individual plaintiffs' claim for breach of the consulting agreements must be dismissed because the consulting agreements unambiguously provide that payments would terminate in June 1999. Consequently, they argue, the defendants' failure to make payments after June 1999 does not constitute a breach of the consulting agreements. Defendants' memorandum of law at 15-17.

---

31. Attached to the reply memorandum is a letter dated April 13, 2000 from Charles Fernald, chief financial officer at the time the agreements were signed. According to the letter, Fernald, who was "personally involved in the [consulting agreement] negotiations from beginning to end," recalls that Niness, Graham and Littlepage were to receive consulting fees for 10 years after the execution of the consulting agreements, unless the plaintiff trust shares were redeemed. Fernald further states that, although the consulting agreements had a seven-year term, "it was understood that the consulting arrangement would continue thereafter for three more years or until redemption of the preferred stock, whichever came first."

32. This serves as a basis for Objection 8, which addresses Count IV.

The individual plaintiffs counter, however, that the consulting agreements are not integrated and that the consulting agreements therefore must be interpreted in light of parol evidence. This evidence, they claim, establishes that payments were to continue through June 2002. Plaintiffs' memorandum of law at 11-13. Based on the allegations in the complaint, the court agrees that the consulting agreements are unintegrated and that the complaint, including the parol evidence referenced therein, alleges a breach of the consulting agreements.

A. Consideration of Parol Evidence if the Consulting Agreements Are Either Not Integrated or Ambiguous

According to the defendants, the plaintiffs seek to introduce parol evidence "that plainly contradict[s] the clear and unambiguous language of the consulting agreements, and [is] thus barred." Defendants' reply at 8-9. Plaintiffs respond by arguing that the consulting agreements "are not full expressions of the parties' intent," and that the court may therefore examine parol evidence, including two CLC memoranda, in evaluating the breach of consulting agreement claim. Plaintiffs' memorandum at 11; complaint at ¶33. This court concludes that parol evidence may be considered if the consulting agreements are either not integrated or ambiguous.

Under Pennsylvania law,[33] the parol evidence rule limits the admission of extrinsic evidence.[34] Under this rule,

---

33. According to paragraph 13, each of the consulting agreements is to be governed by Pennsylvania law.

34. The interpretation and construction of a contract is a matter of law to be decided by the court. *Roman Mosaic and Tile Co. v. Thomas P. Carney Inc.,* 729 A.2d 73, 77 (Pa. Super. 1999).

"[i]f a written contract is unambiguous and held to express the embodiment of all negotiations and agreements prior to its execution, neither oral testimony nor prior written agreements or other writings are admissible to explain or vary the terms of that contract." *Lenzi v. Hahnemann University,* 445 Pa. Super. 187, 195, 664 A.2d 1375, 1379 (1995). See also, *Kehr Packages Inc. v. Fidelity Bank, National Association,* 710 A.2d 1169, 1173 (Pa. Super. 1998) ("before the parol evidence rule is applied, the court must determine, as a matter of law, whether the writing at issue is an integrated agreement").

The most recent Pennsylvania cases indicate that parol evidence will not be excluded unless a contract is both integrated *and* unambiguous. See *Baker v. Cambridge Chase Inc.,* 725 A.2d 757, 771 (Pa. Super. 1999) (excluding parol evidence "[w]here the alleged prior or contemporaneous oral representations or agreement concern a subject which is specifically dealt with within the written contract, *and* the written contract covers or purports to cover the entire agreement of the parties") (emphasis added); *Roman Mosaic and Tile Co. v. Thomas P. Carney Inc.,* 729 A.2d 73, 78 (Pa. Super. 1999) ("[i]n cases where the terms are ambiguous *or* the complete agreement is not recorded, the court must examine the surrounding circumstances to determine the parties' intent") (emphasis added); *West Conshohocken Restaurant Associates Inc. v. Flanigan,* 737 A.2d 1245, 1248 (Pa. Super. 1999) ("[a]lthough a writing may appear to be complete on its face, parol evidence is admissible to vary the contents of the writing when there is proof that the writing does not reflect the true agreement of the parties"); *Kehr Packages,* 710 A.2d at 1173 (determining

issue of integration prior to use of parol evidence rule); *Lenzi,* 445 Pa. Super. at 195, 664 A.2d at 1379 (a court must exclude parol evidence if the "written contract is unambiguous *and* held to express the embodiment of all negotiations and agreements prior to its execution"). As a result, this court submits that the individual plaintiffs may introduce extrinsic evidence if the consulting agreements are not integrated, regardless of whether they are ambiguous.

### B. Integration of the Consulting Agreements

Defendants argue that the consulting agreements "fully express the parties' entire agreement." [35] Reply memorandum at 9. This, however, is not the case. Rather, the consulting agreements are not integrated, and the individual plaintiffs may introduce parol evidence.

To ascertain whether an agreement is integrated, a court "must examine the text of the agreement to determine its completeness." *Kehr Packges,* 710 A.2d at 1173. In so doing, a court may consider all relevant evidence, including any evidence that would be excluded if the parol evidence rule were in effect. *Rempel v. Nationwide Life Insurance Co.,* 471 Pa. 404, 415, 370 A.2d 366, 371 (1977). See also, *Lenzi,* 445 Pa. Super. at 196, 664 A.2d at 1379 ("[t]he parol evidence rule does not preclude the admission of evidence to establish whether the parties *intended* the writing to be a complete embodiment of

---

35. Other than this assertion, the defendants do not address the issue of integration and base their argument solely on the lack of ambiguity in the consulting agreements.

their agreement") (emphasis in original); Murray on Contracts, 3d ed. §84(B).

An agreement is integrated if it represents "a final and complete expression of the parties' agreement." *Lenzi,* 445 Pa. Super. at 195, 664 A.2d at 1379. While integration is presumed if the agreement includes an integration clause, "its absence does not automatically subject the written agreement to parol evidence." *Kehr Packages,* 710 A.2d at 1173. See also, *Baker,* 725 A.2d at 771 (holding that the presence of an integration clause is not determinative where fraud is alleged).

The individual plaintiffs claim that each consulting agreement, as written, does not reflect the complete expression of the parties' agreement. They argue that the consulting arrangement agreed to by the parties is "comprised of several writings which, together, embody the parties' agreement." Reply memorandum at 12. In support of this argument, the plaintiffs rely on *International Milling Co. v. Hachmeister Inc.,* 380 Pa. 407, 110 A.2d 186 (1955).[36]

*International Milling* concerned five identical contracts for the sale of flour. During the course of the negotiations, the purchaser asked for the incorporation of a

36. The plaintiffs also cite *Western United Life Assurance Co. v. Hayden,* 64 F.3d 833 (3d Cir. 1995) to support their claims. However, *Western United* differs significantly from the present case in that all of the relevant documents were executed and the court relied on the fact that the language of the agreement in dispute was ambiguous. See 64 F.3d at 835-36, 839. This fact, combined with the nonbinding nature of federal decisions on Pennsylvania courts, *In re Insurance Stacking Litigation,* 754 A.2d 702, 705 n.6 (Pa. Super. 2000), leads to the conclusion that an extensive analysis of *Western United* is not required.

provision guaranteeing that the flour would meet certain quality standards. The seller replied that it did not wish to violate the form contract but agreed to write a separate letter tying the buyer's specifications into subsequent purchase orders. After the seller sent the letter, the parties executed the five contracts, each of which included an integration clause.

When the flour delivered failed to meet the quality standards set forth in the letter, the buyer rejected the shipments and ultimately canceled the contracts. The seller then brought suit, seeking damages for breach of contract.

In deciding that parol evidence could be used to interpret the five contracts, the Pennsylvania Supreme Court recognized the limitations on the introduction of extrinsic parol evidence. However, the court went on to hold that "where it can be shown by competent evidence that no single writing embodied or was intended to embody the whole of the parties' understanding, the parol evidence rule has no application." 380 Pa. at 418, 110 A.2d at 191. Under this analysis, if the individual plaintiffs show that the consulting agreements did not embody or were not intended to embody the entire agreement, they would be permitted to introduce extrinsic parol evidence affecting the terms of the consulting agreement.

Here, the complaint alleges that the omission of the parties' obligations in the three-year period from July 1999 through July 2002 "was intentional and made at the insistence of [CLTL], whose advisors believed that an express, written 10-year consulting agreement might be recharacterized as a dividend by the Internal Revenue Service." Complaint at ¶33. In spite of this omission, "it

was always the parties' intent and mutual agreement that the consulting agreement would be renewed and/or extended for a total term of 10 years, so long as the series A stock had not been redeemed." *Id.* at ¶34. Furthermore, the individual plaintiffs emphasize that none of the consulting agreements includes language of integration. *Id.*

To bolster their assertions, the plaintiffs also have attached to the complaint two CLC interoffice memoranda. The first, dated March 17, 1992, is from Fernald to Niness and requires that consulting fees be paid "as long as the [series A stock] is outstanding but no less than seven years." This memorandum appears to have been initialed by Fernald.

The second memorandum is dated April 14, 1992 and is from McFadden, then an officer and director of CLC, to Niness. It states that the individual defendants are to receive payment for "*no less* than seven years, and payable thereafter through the tenth year unless the [series A stock] is redeemed prior to that time. In this instance, the payment of consulting fees will cease as of the date of redemption." [37]

---

37. Attached to the plaintiffs' memorandum is a letter from Charles Fernald, who was chief financial officer when the consulting agreements were signed. The Fernald letter states that both parties to the consulting agreements understood that the consulting arrangement would continue for three years beyond the original seven-year term unless the series A stock was redeemed sooner. While the Fernald letter is not attached to the complaint and thus cannot be considered in reviewing a demurrer, *Bailey v. Storlazzi,* 729 A.2d 1206, 1211 (Pa. Super. 1999), it supports the argument that the consulting agreements are not integrated.

The absence of an integration clause, the two referenced CLC memoranda and the allegations in the complaint, if accurate, indicate that the consulting agreements are not a final and complete expression of the parties' agreement. For all of these reasons, the consulting agreements are not integrated. A party may introduce parol evidence if an agreement is not integrated, regardless of whether the agreement is ambiguous. As a result, there is no need to address whether the consulting agreements are ambiguous, and the court may use the parol evidence presented in and with the complaint when reviewing the consulting agreements in the context of these objections.

## C. Breach of the Consulting Agreement Based on the Complaint and Related Parol Evidence

Once a court has determined that parol evidence should be admitted, "it is for the trier of fact to determine what the parties intended by resolving conflicts in the relevant parol evidence." *Drummond v. University of Pa.,* 651 A.2d 572, 580 (Pa. Commw. 1994). For the purposes of preliminary objections, however, there is no conflict to resolve, as a court must regard the facts alleged in the complaint as true. *Sevin v. Kelshaw,* 417 Pa. Super. 1, 7, 611 A.2d 1232, 1235 (1992).

Here, the complaint alleges that "it was always the parties' intent and mutual agreement that the consulting agreements would be renewed and/or extended for a total term of 10 years, so long as the series A stock had not yet been redeemed." Complaint at ¶34. Consequently, the complaint maintains that, "[u]nder the terms of the consulting agreement[s], each [individual] plaintiff is

entitled to $4,500 per month for the 36-month period expiring June 30, 2002." *Id.* at ¶99. The complaint further alleges that none of the individual plaintiffs has breached his own consulting agreement, *id.* at ¶101, and that the defendants have failed to make payments since June 30, 1999. *Id.* at ¶98. Accordingly, the allegations in the complaint support Count IV, and the objections relating to the plaintiffs' failure to allege a breach of the consulting agreements must be overruled.

### V. *Protection of Quality Distribution and Quality Carriers From Liability Due to Corporate Forms* [38]

Quality Distribution and Quality Carriers also assert various objections to the complaint on their own behalf. The court agrees with the corporate defendants in part, and therefore dismisses Count IV (breach of consulting agreement) against Quality Carriers and Counts I (violations of the BCL) and III (breach of exchange agreement) against Quality Distribution.

### A. Liability of Quality Carriers

Quality Carriers argues that it cannot be liable for misrepresentation or breach of the consulting agreements, the exchange agreement or the designation statement because it is not a party to them. Moreover, it contends that it did not assume any of CLC's liabilities because the alleged merger was invalid. Finally, even if the merger effected a transfer of CLC's responsibilities under the exchange agreements to it, Quality Carriers argues that

---

38. This serves as a basis for Objections 1, 4, 8 and 10, which address Counts I, III, IV, V and VI.

it is CLC's subsidiary, CLTL, that entered into the consulting agreements, protecting both CLC and Quality Carriers from liability arising from any misrepresentation or breach due to basic principles of corporate and contract law.

It is true that "a person who is not a party to a contract cannot be held liable for a breach by one of the parties to a contract." *Fleetway Leasing Co. v. Wright,* 697 A.2d 1000, 1003 (Pa. Super. 1997). However, under BCL section 1929,[39] the corporation surviving a merger "shall thenceforth be responsible for all the liabilities of each of the corporations so merged and consolidated." See also, *Park v. Greater Delaware Valley Savings & Loan Association,* 362 Pa. Super. 54, 63, 523 A.2d 771, 776 (1987) ("[w]hen corporations merge, the surviving corporation succeeds to both the rights and obligations of the constituent corporations").

Under the plan of merger, CLC was merged into Montgomery, whose name was then changed to Quality Carriers. Because this court concludes that the merger was effective, Quality Carriers, as the corporation surviving the merger, has assumed CLC's liabilities, including liabilities arising under the exchange agreement. Consequently, Quality Carriers cannot be dismissed as a defendant to Count III (breach of exchange agreement).

Similarly, the allegations in the complaint are sufficient to sustain a claim of misrepresentation against Quality Carriers through actions undertaken by CLC: the complaint alleges that CLC assured the plaintiffs that the consulting agreements would not be terminated after

---

39. 15 Pa.C.S. §1929.

seven years and further asserts that CLC's acts satisfy the elements of misrepresentation. As a result, Quality Carriers' objections to Count V (misrepresentation) are overruled.

However, it is difficult to see how Quality Carriers can be liable for any breach of the consulting agreements, as CLTL, not CLC, was responsible thereunder. In Pennsylvania, "a corporation is to be treated as a separate and independent entity even if its stock is owned entirely by one person." *Commonwealth v. Vienna Health Products Inc.,* 726 A.2d 432, 434 (Pa. Commw. 1999). See also, *Shared Communications Services of 1800-80 JFK Blvd. Inc. v. Bell Atlantic Properties Inc.,* 692 A.2d 570, 573 (Pa. Super. 1997) ("[a]lthough a parent and a wholly owned subsidiary do share common goals, they are still recognized as separate and distinct legal entities"). This creates to a strong presumption against piercing the corporate veil. *Lumax Industries Inc. v. Aultman,* 543 Pa. 38, 41-42, 669 A.2d 893, 895 (1995). Indeed, a Pennsylvania court will pierce the corporate veil "only in limited circumstances when used to defeat public convenience, justify wrong, protect fraud or defend crime," *Kiehl v. Action Manufacturing Co.,* 517 Pa. 183, 190, 535 A.2d 571, 574 (1987), and only after considering such factors as "undercapitalization, failure to adhere to corporate formalities, substantial intermingling of corporate and personal affairs and use of the corporate form to perpetrate a fraud." *Lumax,* 543 Pa. at 42, 669 A.2d at 895. (citation omitted) But see, *Rinck v. Rinck,* 363 Pa. Super. 593, 597, 526 A.2d 1221, 1223 (1987) (permitting piercing of corporate veil "whenever it is necessary to avoid injustice").

Here, neither Quality Carriers nor CLC was a party to the consulting agreements. It would therefore be necessary for the court to pierce the corporate veil to find liability on the part of CLTL's parent corporation.[40] The only possible basis for doing this would be the plaintiffs' allegations of fraud set forth in Count V. However, the fraud alleged in Count V does not involve the use of the corporate form, as is required to pierce the corporate veil. See *Saint Joseph Hospital v. Berks County Board of Assessment Appeals*, 709 A.2d 928, 936 (Pa. Commw. 1998). As a result, the complaint does not support a claim for breach of the consulting agreements against Quality Carriers, and Quality Carriers' demurrer as it relates to Count IV is sustained.

### B. Liability of Quality Distribution

Similarly, Quality Distribution maintains that it is not a party to either the plan of merger or the exchange agreement and therefore cannot be liable for any breaches thereof. As a result, Quality Distribution seeks the dismissal of Counts I, III and VI against it.

As previously discussed, Pennsylvania courts are loathe to pierce the corporate veil to find liability on the part of a parent corporation. Here, Quality Distribution did not sign the exchange agreement and is not alleged to have acquired any of CLC's liabilities through the merger. As a result, Count III for breach of the exchange

---

40. The complaint alleges that CLTL was "absorbed into and controlled by Quality Carriers," complaint at ¶95, but does not allege that CLTL was merged into Quality Carriers. Indeed, the fact that Counts IV and V have been brought against CLTL implies that CLTL remains a separate and distinct entity.

agreement against Quality Distribution should be dismissed.

Count I is also flawed. Pennsylvania courts recognize that "majority stockholders occupy a quasi-fiduciary relation toward the minority which prevents them from using their power in such a way as to exclude the minority *from their proper share of the benefits accruing from the enterprise." Ferber v. American Lamp Corp.,* 503 Pa. 489, 496, 469 A.2d 1046, 1050 (1983). (emphasis in original) However, nothing in Pennsylvania case or statutory law provides that a dominant shareholder has an independent obligation to provide notice of a merger or appraisal rights to other shareholders.[41] Cf. *Santa Fe Industries v. Green,* 430 U.S. 462, 474 (1977) (holding that a breach of fiduciary duty by majority stockholders does not violate section 10(b) of the Securities Exchange Act in the absence of deception, misrepresentation, or nondisclosure);[42] *Gabhart v. Gabhart,* 545 F.2d 877, 881 (7th Cir. 1977) (majority shareholders' knowledge of inadequate notice of merger did not establish liability where the majority shareholder otherwise complied with Indiana corporate law). But see, *Village at Camelback Property Owners Association Inc. v. Carr,* 371 Pa. Super. 452, 461, 538 A.2d 528 (1988), *aff'd,* 524 Pa. 330, 572 A.2d 1 (1990) (piercing corporate veil due to undercapitalization, intermingling of corporate and personal affairs

---

41. Indeed, the plaintiffs do not address this issue in their memorandum.

42. It should be noted that the allegations of misrepresentation in the complaint relate not to the merger, but rather to the consulting agreements.

of shareholder and failure to adhere to corporate formalities).

Therefore, while the plaintiff trusts allege liability on the part of Quality Distribution due to its exercise of "complete control and dominion over the business and corporate activity of Quality Carriers," complaint at ¶65, there are no allegations of improper behavior or BCL violations by Quality Distribution. Consequently, while CLC, now Quality Carriers, may have incurred liability due to corporate missteps in completing the merger, there is no basis for holding Quality Distribution responsible for these mistakes. This requires the dismissal of Count I against Quality Distribution.

The court must disagree, however, with Quality Distribution's argument that the plaintiff is not entitled to an accounting as set forth in Count VI. The complaint alleges that Quality Distribution implemented the integration plan, which led to the elimination of CLC accounts, the liquidation of CLC assets and the naming of CLC as a guarantor of Quality Distribution debt. The complaint also sets forth the allegation that "Quality Distribution, the parent of the merger survivor, no longer recognized any separate corporate existence of CLC." Complaint at ¶59. Consequently, the plaintiffs have substantial grounds for their claim for accounting, and Quality Distribution's objection as to Count VI is overruled.

### VI. *The Breach of Fiduciary Duty Claim Against the Individual Defendants Should Be Dismissed*[43]

The individual defendants argue that the alleged breach of fiduciary duty claim may not be pursued against them

---

43. This serves as a basis for Objections 5 and 7, which address Count II.

in their individual capacities based on their positions with CLC and the corporate defendants. The plaintiff trusts do not respond to this argument in the answer or the reply memorandum.

Under BCL section 1717,[44]

"The duty of . . . individual directors under section 1712 (relating to standard of care and justifiable reliance) is solely to the business corporation and may be enforced directly by the corporation or may be enforced by a shareholder, as such, by an action in the right of the corporation, and may not be enforced directly by a shareholder or by any other person or group."

These statutory provisions indicate that a shareholder may not bring an action against an individual director unless the action is brought as a derivative action on behalf of the corporation. See *B.T.Z. Inc. v. Grove,* 803 F. Supp. 1019, 1022 (M.D. Pa. 1992) (refusing to allow shareholders to bring an action against board members directly).

In addition, Pennsylvania courts have refused to hold individual corporate officers liable in the absence of evidence of malfeasance by the particular officer. See *Brindley v. Woodland Village Restaurant Inc.,* 438 Pa. Super. 385, 652 A.2d 865 (1995). Here, the complaint alleges no improper action by any of the individual defendants. Consequently, Count II (breach of fiduciary duty) against Babbitt, Kasak, Brandewie and O'Brien[45] is dismissed.[46]

---

44. 15 Pa.C.S. §1717.

45. The court need not consider the merit of the objections relating specifically to O'Brien's position as a director of Quality Distribution.

46. When dismissing an action based on a defendant's preliminary objections, a Pennsylvania court may not dismiss the action as to any

## CONCLUSION

For the reasons set forth, the following objections are sustained:

(1) Under BCL section 1717, Babbitt, Kasak, Brandewie and O'Brien have no individual liability for any alleged breaches of fiduciary duty. As a result, their objections to Count II (breach of fiduciary duty) are sustained;

(2) Because Pennsylvania courts are strongly inclined not to pierce the corporate veil, Quality Distribution cannot be held liable for the actions or liabilities of either CLC or Quality Carriers. As a result, Quality Distribution's objections to Count I (violations of the Pennsylvania Business Corporation Law) and Count III (breach of exchange agreement) are sustained; and

(3) Although Quality Carriers assumed the liabilities of CLC through the merger, it did not assume those of CLTL, a subsidiary of CLC and the corporate party to the consulting agreements. As a result, Quality Carrier's objections to Count IV (breach of consulting agreements) are sustained.

All other objections are overruled, and the plaintiffs shall have 20 days to file an amended complaint.

This court will enter a contemporaneous order in accord with this opinion.

---

additional defendants who did not file preliminary objections. *Galdo v. First Pennsylvania Bank N.A.,* 250 Pa. Super. 385, 388, 378 A.2d 990, 991 (1977). Because Ringo is not among the defendants filing the objections, the court has not dismissed Count II as it relates to him.

## ORDER

And now, October 10, 2000, upon consideration of the preliminary objections of defendants, Quality Carriers Inc., Chemical Leaman Tank Lines Inc., Quality Distribution Inc., Elton E. Babbitt, Robert R. Kasak, Richard J. Brandewie and Charles J. O'Brien to the complaint of plaintiffs, First Union National Bank, Samuel F. Niness Jr., Sally Graham, George Graham and Richard C. Littlepage, and plaintiffs' responses to them and all matters of record and in accordance with the opinion being filed contemporaneously with this order, it is hereby ordered that:

(1) The preliminary objections of Babbitt, Kasak, Brandewie and O'Brien as to Count II (breach of fiduciary duty) are sustained;

(2) The preliminary objections of Quality Distribution as to Count I (violations of the Pennsylvania Business Corporation Law) and Count III (breach of exchange agreement) are sustained;

(3) The preliminary objections of Quality Carriers as to Count IV (breach of consulting agreements) are sustained;

(4) All other preliminary objections are overruled; and

(5) The plaintiffs may file an amended pleading within 22 days of this order.